# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DAVID ABARA,

    *Petitioner*,

vs.

JACK PALMER, *et al.*,

    *Respondents*.

3:10-cv-00623-RCJ-VPC

ORDER

    This habeas matter under 28 U.S.C. § 2254 comes before the Court on respondents' motion (#17) to dismiss the petition as untimely under the one-year limitation period in 28 U.S.C. § 2244(d)(1).  In principal part, petitioner seeks to overcome the untimeliness of the petition based upon a claim of actual innocence.

## *Background*

    Petitioner David Abara challenges his 2006 Nevada state conviction, pursuant to a jury verdict, of one count each of burglary and uttering a forged instrument together with his adjudication as a habitual criminal.

    The evidence presented at trial included the following.[1]

---

[1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  The significance of additional specific evidence or categories of evidence referred to by petitioner in support of his argument is discussed *infra*.  The present recital of the evidence constitutes only an overview for context. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's argument.

1    David Abara was charged with having cashed a forged G & W, Incorporated ("G & W")

2    check, made payable to him, at an Alamo Casino in Sparks, Nevada on March 26, 2005.

3    Marian Cox was a cage cashier at the Alamo Casino in Sparks.  According to her

4    testimony, Cox had known David Abara since April 10, 2004.  They worked together for about

5    two months at that time at the Petro Service Center or Petro Shopping Center.  During that

6    time, she became familiar with his handwriting as part of her job duties.  Abara had been

7    elevated from a tech to a shift manager, and the shift manager made handwritten notes on

8    "almost every" service order.[2]

9    Maribel Martinez was the executive secretary at G & W at the relevant time.  G & W

10   operated two businesses – Economy Transmission in Reno and Economy Transmission in

11   Minden.  According to her testimony, Martinez also knew David Abara.  He was a manager

12   of one of the Economy Transmission shops for an approximately two month period beginning

13   in December 2004 and ending on January 20, 2005.  She also was familiar with his

14   handwriting from their working together.[3]

15   Martinez described the following check writing procedures at G & W.  The manager at

16   each shop needed to have checks on hand to pay for parts when they were delivered.

17   Martinez, who had the authority to sign the owner's name, would sign three checks in

18   advance for each shop that then were assigned to that shop's register.  The manager

19   thereafter would fill out the rest of a check when parts were delivered.[4]

20   One of the – initially properly negotiated – checks written pursuant to this procedure

21   was G & W check number 4196.  Martinez signed and Abara completed the rest of the check

22   to pay for a part purchased from a supplier in early January 2005.  #18, Ex. 2, at 32-36.

23   / / / /

24

25   [2]#18, Ex. 2, at 7 & 9-11.  See also the discussion in note 37, *infra*, regarding the Alamo Casino being
26   associated with a Petro Truck Stop and Shopping Center at the same location.

27   [3]#18, Ex. 2, at 28-32, 38-40 & 44.

28   [4]*Id.*, at 29-30, 35-36 & 41.

1      Marian Cox described the following check cashing procedures at the Alamo Casino.

2  The small truck stop casino was not linked to a credit system like major casinos in the Reno-

3  Sparks area used.  The casino instead would cash checks only for customers who previously

4  had filled out a credit application, had cleared a credit check through a bank, and thereafter

5  had been entered as approved in the cashier's computer.  Most of the customers approved

6  for check cashing were businesses.  Handwritten checks would be accepted only if

7  "handwritten o.k." was designated in the computer for the account per the business

8  customer's instructions.  When a check was cashed, the cashier would have the customer at

9  the window sign the check on the back and put their thumb print on the front.  The cashier

10  then would write on the check the customer's identification number, such as from a driver's

11  license, along with their date of birth and a contact phone number.[5]

12      Cox and Martinez gave the following testimony specifically regarding the forged check

13  that was cashed.

14      According to Cox' testimony, during the early morning hours of March 26, 2005, David

15  Abara came to the cashier's cage along with his wife.  Cox recognized Abara from their

16  having worked together before.  They chatted and joked around a bit while she was handling

17  the transaction, with Abara saying that he would check in a couple of weeks on some noises

18  that Cox' car was making.  Cox positively identified Abara at trial as the person present that

19  morning who cashed a check.[6]

20      Abara presented what appeared to be a check drawn on the G & W account bearing

21  check number 4196.  The purported check was payable to David Abara with the notation that

22  it was for payroll for March 18th to March 25th, which would have been after Abara left G & W's

23  employ on January 20, 2005.  The purported check was payable in the amount of $994.97.

24  This amount was just below the $1,000.00 authorization check cashing limit reflected for G

25  & W in the Alamo Casino cashier's computer.  The purported check physically resembled

26

27      [5]#18, Ex. 2, at 8-9, 14, 16 & 24.

28      [6]*Id.*, at 9, 11-12 & 17.

1  legitimate G& W checks, and Martinez testified that it bore a signature that was "[n]ot exactly,
2  but pretty close" to Martinez' signature for the owner.[7]

3      Cox recognized the remaining handwriting on the check as Abara's handwriting.  The
4  handwriting was "messy," which usually was something that would raise a caution flag when
5  cashing checks.  However, Abara previously had cashed a G & W check at the casino; G &
6  W was one of the companies that allowed checks filled out in handwriting to be cashed; the
7  check was under the authorization limit; and Cox knew Abara.  She therefore proceeded with
8  the transaction.[8]

9      Cox had Abara sign the back of the check and put a thumb print on the front of the
10  check.  She then wrote down his license number and birth date from his driver's license and
11  the telephone number that he gave her, along with her initials.  Abara said that he was
12  cashing the check that night because he and his wife were going to California to visit
13  relatives.[9]

14      The first sign of a problem came when the bank called Maribel Martinez.  The
15  purported check figuratively had raised a red flag at the bank because the 4196 check
16  number was out of sequence.  Martinez confirmed that the check was not a legitimate check.
17  She testified at trial that the handwriting on the check was Abara's handwriting.  She
18  acknowledged on cross-examination, however, that "[y]ou could say that" there were "some
19  differences" between the handwriting on the legitimate 4196 check filled out by Abara and the
20  "messier" handwriting on the forged check 4196.[10]

21      Marian Cox learned of the problem with the check over two weeks after it was cashed,
22  on April 13, 2005.  At that time she was asked to write a statement.  In that statement, she
23  described the individual who cashed the check as being 5'10" tall, weighing 190 to 200

24

25      [7]#18, Ex. 2, at 12-15 (Cox); *id.*, at 36-38 (Martinez); see also *id.*, Ex. 12 (exact amount of check).

26      [8]#18, Ex. 2, at 12-14 & 16-17.

27      [9]*Id.*, at 14-15, 17, 19-20, 22-23 & 24-25.

28      [10]*Id.*, at 38-39 & 42; *Id.*, Ex. 2A, at 43-44.

pounds, and having a mustache.  Petitioner apparently is taller than 5'10", weighed differently than 190 to 200 pounds at trial, and did not have a mustache at trial.  Cox testified that she "really cannot judge" height when someone was standing away from her and that she "figured 200" because "he's kind of medium built" and "was quite stocky at the time."  She further testified that he had a mustache when he cashed the check.[11]

Cox also wrote down a different telephone number for Abara than the one listed on the check in a note that she sent to the police.  She testified that this second number was a cell phone number given to her by Petro techs that were upset over what Abara had done and were trying to help locate him.  This occurred subsequent to the time that she first learned on April 13, 2005, that the check was a forged check.[12]

Cox ultimately was reprimanded by the casino for accepting the check.[13]

When the casino cashier was asked on cross whether any forensic analysis had been done of the fingerprint on the check, she hardly surprisingly responded:  "I have no idea."[14]

The State did not present any forensic fingerprint, handwriting or other expert evidence at trial.  The State presented testimony from only the two witnesses, Cox and Martinez.

Defense counsel's closing argument included, *inter alia*, the following queries:

> Furthermore, did the State present evidence through a casino video of David going in and doing this?
>
> Let's talk about the fingerprint.  There is a fingerprint on the check.  Did anybody prove that that thumb print is that of Mr. Abara, that that thumb matched David Abara?

#18, Ex. 2A, at 63.

---

[11]#18, Ex. 2, at 20-27.  In the copy of the April 13, 2005, statement attached with the petition, Cox clearly identifies Abara by name, not merely by the description of being "about" 5'10", along with additional detail consistent with her trial testimony.  See #9, at electronic docketing page 81.  See also the discussion, *infra*, at 11-12 (discussion of challenge to the reliability of Cox' testimony based upon the statement).

[12]#18, Ex. 2, at 22-23 & 25-27.

[13]*Id.*, at 16.

[14]*Id.*, at 24.

1    Turning to background as to untimeliness, petitioner's judgment of conviction and

2  habitual criminal adjudication were affirmed in substantial part on direct appeal, with a partial

3  reversal and remand for a correction to the judgment of conviction.  The state supreme court's

4  order was filed on April 6, 1997, and the remittitur issued on May 2, 1997.[15]

5    Pursuant to Supreme Court Rule 13(3), the time period for filing a petition for a writ of

6  *certiorari* in the United States Supreme Court expired ninety days after the April 6, 1997, state

7  supreme court order, on Thursday, July 5, 1997.

8    An amended judgment of conviction making the correction directed by the Supreme

9  Court of Nevada was filed on April 19, 2007.[16]  Both the filing of the corrected judgment and

10  the expiration of the thirty-day time period for possibly appealing from the corrected judgment

11  occurred prior to the expiration of the time for seeking *certiorari* on July 5, 1997.

12    Under Nevada state law, the state limitations period for filing a state post-conviction

13  petition expired one year after the May 2, 1997, remittitur.  Under established state law

14  precedent, the date of filing the petition rather than the date of mailing controls, as a prison

15  mailbox rule is not followed in Nevada regarding the timeliness of a state post-conviction

16  petition.[17]  In the present case, the state district court clerk received and filed a state petition

17  by Abara on May 20, 2008, more than one year after May 2, 1997.[18]

18    The state district court denied the petition as untimely.  The order was filed on July 24,

19  2009, and formal notice of entry of the order was mailed on September 29, 2009.[19]  The court

20  found as follows with regard to petitioner's timeliness argument:

21      Petitioner argues his Petition was executed in a timely
      manner and apparently returned in order to allow the Petitioner to
22      execute an affirmation concerning the document's lack of social

23  _____

24  [15]E.g., #9, at electronic docketing pages 39 & 123-26.

25  [16]#18, Ex. 5.

26  [17]*See Gonzales v. State*, 118 Nev. 590, 595, 53 P.3d 901, 904 (2002).

27  [18]#18, Ex. 6.

28  [19]*Id.*, Ex. 7.

1
2
3

> security numbers.  Upon review of the record, this Court cannot find any corroborative evidence that the delay was not the fault of the Petitioner.  Absent such a demonstration, the Petition is procedurally barred pursuant to NRS 34.726.  Therefore, the Petition shall be denied.

4

E.g., #9, at electronic docketing page 36.

5

In a September 10, 2010, order, the Supreme Court of Nevada affirmed the denial of

6

the state petition on the ground that the petition was untimely.  The state high court held, *inter*

7

*alia*, as follows:

8
9
10
11
12
13
14
15

> . . . .   Appellant argues that the district court clerk, in returning his timely initial petition as incomplete for failing to include the social security number affirmation, was an impediment external to the defense that prevented his compliance with the procedural default rules. See Hathaway v. State, 119 Nev. 248, 252, 71 P.3d 503, 506 (2003). However, in his petition below, appellant did not claim that his initial petition was timely received by the district court — that is, on or before the May 2, 2008, deadline — but only argued that his initial petition was executed in a timely manner. As a petition's timeliness is determined not by its execution or mailing date but by the date it is received by the court, Gonzales v. State, 118 Nev. 590, 595, 53 P.3d 901, 904 (2002), even if appellant's assertion were true, he would not have been entitled to relief. Accordingly, appellant was not entitled to an evidentiary hearing on this argument.[FN1]

16
17
18
19
20
21
22
23

> [FN1] On appeal, appellant states that he executed and mailed the petition on May 1, 2008, and that it was received by the district court sometime before May 8, 2008.   As this information was not presented below, we will not consider it on appeal. . . . .   However, even had this information been presented below, it would not have been sufficient to warrant an evidentiary hearing as appellant still does not claim that the petition was received by the court prior to the May 2, 2008, deadline. Moreover, the district court's finding that nothing in the record corroborates appellant's allegations that the petition had been previously returned is supported by the record and is not clearly wrong. . . . .

24

E.g., #9, at electronic docketing pages 43-44.

25

The remittitur issued on October 7, 2010.[20]

26

The federal petition was mailed for filing on or about September 27, 2010.

27

28

[20]#18, Ex. 10.

1

*Discussion*

2

*Calculation of the Federal One-Year Limitation Period*

3   Under 28 U.S.C. § 2244(d)(1)(A), the federal one-year limitation period, unless

4   otherwise subject to tolling or delayed accrual, begins running after "the date on which the

5   judgment became final by the conclusion of direct review or the expiration of the time for

6   seeking such direct review."   In the present case, the limitation period, unless otherwise

7   subject to tolling or delayed accrual, thus began running after the expiration of the time period

8   for filing a petition for *certiorari, i.e.,* after July 5, 2007.  Absent tolling, the one-year limitation

9   period would expire one year later, on Monday, July 7, 2008.

10   Under 28 U.S.C. § 2244(d)(2), the federal one-year limitation period is statutorily tolled

11   during the pendency of a properly filed application for state post-conviction relief.  However,

12   an untimely state post-conviction petition is not "properly filed;" and it thus does not statutorily

13   toll the federal limitation period. *Pace v. DiGuglielmo,* 544 U.S. 408 (2005).  Petitioner's state

14   post-conviction petition was denied as untimely, and the petition therefore would not

15   statutorily toll the federal limitation period under § 2244(d)(2).

16   Accordingly, absent tolling or delayed accrual, the federal limitation period expired on

17   July 7, 2008.  The federal petition was not mailed for filing until over two years later, on or

18   about September 27, 2010.  The federal petition therefore is untimely on its face.

19   *Alleged Actual Innocence*

20   Petitioner previously has sought to overcome the untimeliness of the federal petition

21   on a number of grounds, including equitable-tolling arguments as well as arguments

22   maintaining his alleged actual innocence.  At this point, the principal argument that petitioner

23   advances in opposing respondents' motion to dismiss is based on alleged actual innocence.

24   He raises a number of factual  arguments that the Court discusses in turn below.

25   The majority opinion in *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011)(*en banc*), states

26   that "we hold that a petitioner is not barred by the AEDPA statute of limitations from filing an

27   otherwise untimely habeas petition if the petitioner makes a credible showing of 'actual

28   innocence' under *Schlup v. Delo*[, 513 U.S. 298 (1995)]."  653 F.3d at 945; *but cf.* 653 F.3d

at 945-46 (Kozinski, C.J., concurring in the result)(stating that there was no occasion to consider the issue because the petitioner did not present a colorable claim of actual innocence).

The United States Supreme Court granted a petition for a writ of *certiorari* in *McQuiggin v. Perkins*, 133 S.Ct. 527 (2012), raising, *inter alia*, the question of whether the one-year time bar may be avoided on a showing of actual innocence.  Oral argument was held in *McQuiggin* on February 25, 2013, and it is anticipated that action of some nature will be taken on the petition before the end of the current term on June 30, 2013.[21]  In the present case, however, resolution of the issue presented in this case does not turn upon the outcome in *McQuiggin*. Petitioner cannot establish actual innocence in this case under the *Schlup* standard even if actual innocence otherwise is available to overcome the federal time bar under controlling Supreme Court and/or Ninth Circuit precedent at the time that this case is reviewed.

In order to satisfy the *Schlup* actual innocence gateway, where applicable, a petitioner must come forward with new reliable evidence that was not presented at the trial that, together with the evidence adduced at trial, demonstrates that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt.  *E.g., Schlup*, *supra*.  The evidence need not be newly discovered, but it must be "newly presented." *See Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003).   In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency.  *See, e.g., Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).  The court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial," and "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332.

/ / / /

---

[21] The Court notes that it is not inconceivable that the Supreme Court may decline to reach and resolve the issue in *McQuiggen*.  Any number of potential outcomes, including even dismissal of the writ of *certiorari* as improvidently granted, are possible.  Meanwhile, this Court sees no substantial benefit from deferring final disposition of this matter, given the evidence presented.

1    In the present case, Abara relies, first, upon a June 28, 2005, report of a forensic

2   analysis of the thumbprint or fingerprint on the forged check.  The report was filed into the

3   record in this matter in response to the Court's order directing that respondents address the

4   timeliness issue and file certain materials.[22]   In the brief report, the latent print examiner

5   states the following results:  "The fingerprint appearing on the check listed under Exhibit #1

6   is of no value for comparison and/or AFIS purposes."[23]

7    Petitioner contends that this report "clearly supports the petitioner's claim of actual

8   innocence."[24]  *Arguendo* establishing alleged "clear support," however, is not the standard that

9   petitioner must satisfy to pass through the *Schlup* actual innocence gateway.  Petitioner

10  instead must present evidence that, together with the trial evidence, demonstrates that it is

11  more likely than not that no reasonable juror would have found him guilty beyond a

12  reasonable doubt.

13    It is not more likely than not that no reasonable juror would have found Abara guilty if

14  the report had been presented along with the remaining trial evidence.  Abara was positively

15  identified as the check presenter by a cashier who knew him personally, who was familiar with

16  his handwriting, and who, *inter alia*, took down his license number and date of birth from his

17  driver's license.  Moreover, Abara had worked at the company that was the ostensible drawer

---

18

19  [22]See #13.  Petitioner urges that the filing of the report in response to the Court's order establishes
    that the State withheld favorable evidence from the defense during the original criminal proceedings in
20  violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Whether the State did or did not violate *Brady* is not
    directly material to the present inquiry.  That inquiry is whether petitioner can demonstrate actual innocence
21  under *Schlup* in order to overcome the untimeliness of the overall original petition in this matter.  On that
    inquiry, petitioner need not show under *Schlup* that the evidence was withheld by the State or even that it is
22  newly discovered evidence by the petitioner.  He instead need show merely that the evidence is newly
    presented, *i.e.*, that the evidence was not presented at trial.  *Griffin, supra*.  The fingerprint analysis report
23  was not presented at trial.  It therefore may be considered in conjunction with the trial evidence in determining
    whether petitioner otherwise can satisfy the *Schlup* gateway.
24
    The Court discusses potential issues particular to the *Brady* claim, *infra*, at 27-29.  The question at
25  present, however, is whether the untimeliness of the overall petition in this matter can be overcome on a
    showing of actual innocence.  Petitioner, again, need not show on that issue that the evidence was withheld
26  but instead only that it was not presented at trial.

27  [23]#18, Exh. 12.  See also *id.*, Ex. 11 (foundation exhibit as to chain of custody).

28  [24]#23, at 2.

1   of the forged check; he had access to company checks in the course of his duties, including

2   an earlier legitimate check bearing the very same check number as the forged check; the

3   executive secretary for the company also recognized his handwriting (albeit a "messier"

4   version thereof) on the forged check; and the check was made payable to David Abara

5   himself, providing strong circumstantial evidence against petitioner in addition to the direct

6   evidence of guilt provided by the cashier.  The mere fact that the thumbprint taken at the time

7   on the front of the forged check was of no value on forensic examination would not make it

8   more likely than not that no reasonable juror would have found Abara guilty on the evidence

9   presented.  Indeed, the defense specifically had relied on the fact that the State had not

10  presented forensic evidence establishing that the thumbprint on the check had been

11  established to be Abara's.  Thus, even if the report itself *arguendo* could have provided an

12  additional talking point for the defense in that same vein, the report does not establish that

13  it is more likely than not that no reasonable juror would have found Abara guilty if the report

14  had been presented at trial.[25]

15          Abara seeks to discount the cashier's testimony, however, on the following basis:

16                  It is clear that the testimony of Ms. Cox is not supported by
                    any physical evidence and any evidence which would normally
17

18          [25]Petitioner posits that the prosecutor relied on and referred to "the fingerprint evidence" in his
19  opening statement and closing argument with "knowledge of the forensic reports which he intentionally
    withheld." #23, at 7.  Petitioner's argument suggests more than what the trial record reflects.  The prosecutor
20  did state in the opening statement that Cox "obtained a thumb print from the defendant on the check." #18,
    Ex. 2, at 3, lines 20-21.  That statement was fully supported by Cox' testimony that she obtained a thumbprint
21  on the check and that she recognized Abara at the time of the transaction.  The argument at the citation that
    petitioner gives as to the closing argument does not make any reference to a fingerprint.  See #18, Ex. 2A, at
22  60, lines 11-12 (". . . .  It was given to her, it was passed by him.  That is evidenced on the exhibit.").

23          The prosecutor never stated that there was *forensic* fingerprint evidence establishing that the
    thumbprint was Abara's.  His statements and argument instead were based upon Cox' testimony as to the
24  thumbprint, and, as noted, the defense specifically argued that no forensic fingerprint evidence was
    presented establishing that the thumbprint was Abara's.  Petitioner's argument on this point perhaps would
25  have some traction – at least as to some other issue – if the prosecution had misrepresented that there was
    forensic fingerprint evidence establishing that the fingerprint was his, but that is not what happened at trial.
26
            In all events, what the prosecution said in the opening statement and closing argument does not
27  establish Abara's actual innocence under the *Schlup* standard.  Petitioner needs to first get through the
    *Schlup* gateway before he can pursue, *e.g.,* claims of prosecutorial misconduct.  Purported prosecutorial
28  misconduct, in and of itself, will not clear that gateway absent the requisite proof of actual innocence.

1    have supported her testimony was withheld by the prosecution as
     established by the forensic fingerprint report . . . .
2
           In addition, her testimony is obviously coached and
3    contrary to her initial police report . . . and was the clear result of
     prosecutorial misconduct.
4

5    #23, at 7 (exhibit citations omitted).

6          The April 13, 2005, handwritten statement that petitioner attaches reads -- as tendered

7    by petitioner -- in full as follows:

8          The only reason I cashed the G & W Inc. check was that
     the person who was cashing it is known to me.  David Abarra
9    used to work at the Petro Service Center.  While there, he would
     sometimes be my asst. manager and I am a service writer.  He
10   also works (worked?) at National Auto Repair at 1725 Prater Wy.,
     Sparks, NV.  355-5858.  David is not Hispanic.  He is about 5'10",
11   190-210 lbs Lt. Brown hair, & a mustache.  I don't know what
     color of eyes.
12
           When I cashed the check, David mentioned he & his wife
13   were going to Calif. to visit relatives for the weekend.

14         David has been seen in Reno as of 3-4 days ago.

15   #23, Ex. C (at electronic docketing page 27)(copy also filed with #9).

16         Cox' April 13, 2005, handwritten statement is entirely consistent with her trial testimony.

17   The only apparent "discrepancy" was that the description given by Cox – who apparently was

18   not a trained observer of such matters like a police officer would be – apparently did not fully

19   match Abara's height or his weight and facial hair at least as of the time of the trial.  That

20   "discrepancy" was fully explored on cross-examination.  Nothing in the statement supports

21   petitioner's bald assertions that Cox' testimony was "obviously coached," was contrary to her

22   trial testimony, or was the result of prosecutorial misconduct.  Further to the point, there in

23   truth is no "newly presented" evidence within the statement, other than that the document

24   itself was not introduced into evidence at trial.  Finally, even further to the point, there is

25   absolutely nothing in the statement that would have unequivocally discredited Cox' testimony

26   and made it more likely than not that no reasonable juror would have found Abara guilty

27   based on her testimony.  The difference in the description, again, was fully explored at trial

28   on cross-examination.

1   Abara's argument that Cox' testimony was "not supported by any physical evidence"

2   presents an oft-heard refrain that seems to find perpetual favor in the jailhouse but which in

3   truth has no merit in the courthouse.  There is no requirement under the law that a witness'

4   testimony be supported by physical evidence to provide a fully viable basis for a conviction.

5   Nor is there a requirement that the prosecution present every form of physical evidence

6   conceivable – such as forensic fingerprint evidence, forensic handwriting expert analysis, and

7   surveillance video – to prove a defendant guilty.  Cox' testimony that the check was cashed

8   by Abara, who she knew, was fully sufficient to support a conviction, even without

9   corroborating physical forensic evidence.  Moreover, the forensic fingerprint report does not

10  undermine her testimony.  All that the report establishes is that the thumbprint taken was of

11  no value.  Cox testified only that she had the customer place his thumbprint on the front of

12  the check; she did not testify that the thumbprint made by Abara during the transaction

13  ultimately had forensic value.[26]

14  Petitioner must do more than present quibbles with a witness' testimony in which he,

15  *e.g.*, pejoratively dismisses the testimony as "obviously coached" and "unsupported by

16  physical evidence."  He instead must demonstrate that no reasonable juror could accept the

17  testimony, following upon evidence that was not presented at trial.  His attempt essentially to

18  rehash trial evidence fails to do so with regard to Cox' testimony.

19  _____

20  [26]Abara posits that he "has established that . . . Marian Cox's statement that the fingerprint on the
check belonged to the petitioner was in fact false."  #23, at 9.  Petitioner has established nothing of the sort.

21  The forensic report establishes only that the fingerprint had no forensic value.  The report does not establish
that the fingerprint was of someone else other than Abara.  Such an inconclusive report does not establish

22  that Cox' testimony that she had Abara place his thumbprint on the check was false.   Mischaracterization of
the record does not aid petitioner's argument.

23
Petitioner also states that Cox' allegedly inconsistent police statement also raises "doubts as to her

24  reliability to identify handwriting as she is no handwriting expert and it had been over two years since she had
seen any samples of the petitioner's handwriting."  #23, at 10.  Nothing in the statement raises such doubts or

25  even pertains to her ability to recognize Abara's handwriting.  When the forged check was presented, it had
not been over two years since Cox had seen Abara's handwriting.  Cox' testimony was that she recognized

26  Abara's handwriting *when the forged check was presented*.  The interval between that time and the later trial
is immaterial to that testimony.  Petitioner simply is attempting to use a police statement that in truth was

27  consistent with Cox' trial testimony in an effort to bootstrap his way to arguments that simply rehash possible
arguments – and not necessarily persuasive arguments – regarding Cox' testimony that were available at

28  trial.

1    Abara also seeks to discredit Maribel Martinez' trial testimony as being "totally different

2    from her police report."

3    The June 9, 2005, handwritten statement that petitioner attaches reads -- as tendered

4    by petitioner -- in full as follows:

6    > G & W Inc is one of our corporations and David Abara
>    counterfeited a few checks from both of our corporations the
7    > check #4196 that was cashed at Sierra Sids in the amount of
>    #994.97

8    #23, Ex. E (at electronic docketing page 34).

9    The only issue with the statement – as tendered by petitioner – is that the statement

10   refers to the check being cashed at "Sierra Sids" rather than at the Alamo Casino.  Perhaps

11   Abara cashed more than one forged check number 4196 at multiple locations.  Perhaps

12   Martinez – who was not present when the check was cashed – simply misspoke, was

13   confused, or was misinformed at that time of the statement regarding the location where the

14   forged check was cashed.[27]  Petitioner has not established that – had Martinez been cross-

15   examined regarding this alleged prior statement at trial – the State's entire case would have

16   come crashing down and that it then would have been more likely than than not that no

17   reasonable juror would have found Abara guilty.  Under petitioner's own presentation in

18   opposition to the motion to dismiss, the forged check was cashed at the Alamo Casino, not

19   Sierra Sid's.[28]  Whatever the reason was for the reference to Sierra Sid's in Martinez' alleged

20   prior statement, the check in evidence was cashed at the Alamo Casino with no references

21   on the negotiated check to Sierra Sid's; Cox testified that it was David Abara that cashed the

22   check at the Alamo Casino; and Martinez testified that the check in evidence that was cashed

23   at the Alamo Casino was a forged check.  The alleged prior statement does not establish that

24   no reasonable juror would have found Abara guilty beyond a reasonable doubt.

---

[27]The Court takes judicial notice that the Sierra Sid's Casino similarly is a smaller truck stop casino located also off of Interstate 80 in Sparks, two exits away from the Alamo Casino.

[28]See #23, Ex. D, at electronic docketing pages 30-31.

-14-

1    Petitioner's remaining arguments run the gamut of virtually every conceivable basis for

2    claiming actual innocence, from a purported ironclad alibi that rests ultimately on his own self-

3    serving assertions and which was too insubstantial to present at trial, to a phantom suspect

4    that unidentified Sparks police officers told him instead cashed the forged check at the

5    aforementioned Sierra Sids, and additionally to once again unidentified officers telling him of

6    suppressed surveillance video and forensic handwriting analysis.

7    All of these allegations, as discussed further in detail below, ultimately are based upon

8    only petitioner's own self-serving assertions as to critical details.

9    In this regard, as noted previously, the Court, in assessing the reliability of new

10   evidence tendered by a petitioner "may consider how the timing of the submission and the

11   likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup*, 513

12   U.S. at 332.  Here, petitioner is presenting self-serving allegations – on multiple key points

13   that do not appear to be reasonably likely to be subject to corroboration – by a convicted felon

14   who is seeking release from two concurrent life sentences with the possibility of parole after

15   ten years.  Moreover, at the time of the charges in this particular case, Abara had up to 15

16   prior convictions from 1989 through 2005, including several felony convictions and multiple

17   convictions involving a dishonest act or false statement, including 1997, 2002 and 2003

18   convictions for forgery, uttering a forged instrument, and making or passing fictitious checks.

19   Also, at roughly the same time as the original criminal proceedings in this matter, Abara was

20   charged and convicted of an additional felony conviction involving a dishonest act or false

21   statement, to wit, obtaining or using the identity of another.  He was sentenced to additional

22   lengthy terms in that matter that appear to run consecutively to the sentence in this case.[29]

23   Self-serving statements by an individual seeking to avoid such substantial prison time and

24   with such a well-documented history of criminal disregard for honesty generally are not

25   considered as bearing the highest indicia of reliability in assessing claims of actual innocence.

26   _____

27   [29]See,e.g., No. 3:10-cv-00688-LRH-VPC, #25, Ex. 35 (sealed exhibit; presentence report); #21, Ex.

28   54 (judgment of conviction).  Even *arguendo* taking into account Abara's arguments as to the correctness of certain entries in the PSR in various state and federal filings, the thus-distilled statement in the text is correct.

1    With particular respect to the alleged alibi, Abara maintains that he instead was on a

2  trip to Hayward, California at the time of the offense, staying at a Vagabond Inn.

3    Petitioner presented a somewhat similar argument to the Supreme Court of Nevada

4  seeking to establish actual innocence based on an alibi.  He tendered a purported receipt

5  from the Vagabond Inn reflecting a two-night stay on March 26-27, 2005, with the $86.29 per

6  night bill being paid in cash.  Abara also tendered affidavits from two individuals in Hayward

7  attesting that he arrived at their residence at 9:00 p.m. on March 26, 2005.[30]

8    The Supreme Court rejected this purported alibi for the following cogent reasons:

9    . . . . Appellant's evidence merely indicated that he arrived
     at a Hayward, California, residence some 18 hours after the
10    commission of the crimes. Further, the evidence at trial was that
     appellant stated he was cashing the check because he was going
11    to visit relatives in California.  Accordingly, even if appellant's
     alleged facts were true, he would not have been entitled to relief
12    because his new evidence was consistent with that presented at
     trial such that there would be no possibility that a reasonable juror
13    would not have convicted him in light of that evidence.

14  E.g., #9, at electronic docketing pages 45.

15    Petitioner now maintains in opposition to the motion to dismiss:

16

17    The Respondents attempt to create a time line for my
     whereabouts[,] however, the Vagabond Inn receipt if it had been
18    presented and properly investigated, would have shown an arrival
     time of between 6:00 AM and 6:30 AM on March 26, 2005.  I
19    have attempted to contact the Vagabond Inn in Hayward by mail
     to verify this but have not received any answer.

20    The petitioner left the Reno area around 10:00 p.m. on
     March 25th, 2005 and made stops at Sacramento and Vallejo
21    before reaching Hayward.

22  #23, at 11.

23    Petitioner's current alibi argument thus proceeds on his own self-serving, and

24  uncorroborated, assertions:  (a) that he left the Reno area around 10:00 p.m. on March 25,

25  2005; and (b) that he checked into a mid-priced chain hotel at 6:00 a.m. to 6:30 a.m. rather

26  than the mid-afternoon check-in time that is the industry norm – all with no additional charge

27

28    [30]E.g., #9, at electronic docketing pages 75-77.

-16-

shown on the receipt for the alleged early check-in on March 26, 2005, for the two-night stay. It does not appear that any such factual assertions were made to the Supreme Court of Nevada in the state post-conviction appeal briefing.  Petitioner, through counsel, instead maintained in both the opening brief and the reply brief that the affidavits purportedly establishing that he arrived at the affiants' home at 9:00 p.m. on March 26, 2005, demonstrated that he could not be present at the time of the offense.[31]

Even in an unlikely scenario in which petitioner substantiated this implausible late-breaking revision to his alibi defense as to an early morning check-in time, he would be unable to demonstrate that no reasonable juror would find him guilty if presented with this revised alibi defense in conjunction with the trial evidence.  Cox testified that Abara presented the check at the Alamo Casino at 1950 East Greg, Sparks Nevada, "after 1:30 a.m., because the last person who works in the cage on swing shift leaves at 1:30 a.m."  She testified that she "would estimate it was probably between 2:00 and 3:00."[32]  It is not at all implausible – in assessing the reliability and materiality of this newly re-minted self-serving account – that Abara could leave the Alamo Casino in Sparks within the indefinite timeframe testified to by Cox and drive portal to portal on Interstate 80 to the address on the Vagabond Inn receipt in Hayward on the east side of San Francisco Bay to arrive between 6:00 and 6:30 a.m.[33]

_____

[31]The Court takes judicial notice of the online docket record on petitioner's state post-conviction appeal in No. 54810 in the state supreme court, at: http://caseinfo.nvsupremecourt.us/public/caseSearch.do.

[32]#18, Ex. 2, at 7 & 12.  It would be difficult to find that this testimony was "coached" or crafted to avoid an alibi defense.  N.R.S. 174.233 requires a defendant to provide notice of an alibi defense 10 days before trial and there is no indication in this record that Abara gave such notice in advance of the trial.

[33]The Court notes that Google Maps reflects that a drive from the Alamo Casino to the 20455 Hesperian Boulevard address in Hayward would take 3 hours and 43 minutes, with the driving all on Interstate 80 from Sparks into Oakland and then on Interstate 880 to near the Hayward address.  That of course assumes that the driver did not exceed the speed limit on the all-interstate drive.  Moreover, the prospect of traffic congestion would be minimal during a drive in the wee hours of the morning -- all assuming purely _arguendo_ that this late-breaking revised alibi scenario had any basis in actual fact in the first instance.

The Court further notes, in passing, that it appears that the former Vagabond Inn at the Hayward location has been closed.  It is subject to substantial question whether anyone would be able to retrieve records now going on eight years later verifying a 6:00 to 6:30 a.m. check-in, assuming that such records
(continued...)

-17-

1    Moreover, petitioner tenders only his own self-serving assertion in support of the

2    factual allegation that he instead left the Reno area at 10:00 p.m. the prior evening.  An alibi

3    defense at trial premised to any extent on petitioner's own self-serving account – which is all

4    that the Court has before it on Abara's tendered showing on the actual-innocence issue –

5    would open the door to impeachment by the State based upon petitioner's prior extensive

6    convictions, including in particular his convictions involving dishonesty and false statement.

7    Quite clearly, petitioner cannot establish that it is more likely than not that no reasonable juror

8    would find him guilty if presented with an alibi defense that – on the showing made in

9    opposition to the motion to dismiss – ultimately is grounded in uncorroborated, self-serving

10   testimony by a defendant that is subject to impeachment by multiple prior convictions,

11   including convictions involving dishonesty and false statement.

12   Presentation of this late-breaking, self-serving, and wholly uncorroborated revision to

13   petitioner's post-trial alibi account thus would not demonstrate that no reasonable juror could

14   find Abara guilty beyond a reasonable doubt.[34]

15   / / / /

16

17   ─────────────

18   [33](...continued)

     would have been maintained for any length of time in the first instance.  Moreover, the receipt presented by

19   petitioner reflects payment in cash, such that there would not necessarily be a credit card record of the
     alleged stay and check-in time.  Petitioner has the burden of proof on the actual-innocence issue.  His mere

20   supposition as to what records that may not have been preserved in the first instance may have shown, in the
     final analysis, does not carry his burden of proof, particularly on a belatedly-revised self-serving factual

21   assertion that is implausible on its face in the first instance.  Moreover, as discussed in the text, *infra*, even
     with an *arguendo* 6:00 to 6:30 a.m. check-in, petitioner's allegation that he left the Reno area at 10:00 p.m.

22   the prior evening has no support other than his own purely self-serving assertion.

23   [34]Of course, if Abara's late-breaking alibi account did indeed have such impact -- *i.e.*, such that no
     reasonable juror would have found Abara guilty in light of such alibi evidence -- such an allegedly ironclad

24   alibi defense quite likely would have been actually presented at trial.  Petitioner knew where he allegedly was,
     and it would have been far easier to develop corroborating evidence – if there in truth was any to be

25   developed – as to the hotel check-in prior to trial and closer to the alleged alibi events.  Any possible claim
     that the alibi defense tendered to this Court was neglected due to ineffective assistance of counsel would not

26   be persuasive.  While *presenting* the implausible and self-serving alibi defense that petitioner tenders to this
     Court -- and thereby opening Abara to impeachment with his extensive prior criminal record  -- quite arguably

27   would have been ineffective assistance, *declining* to do so clearly would not have been.  The *Schlup* actual
     innocence gateway undeniably is not satisfied by the presentation of such an inartfully concocted late-

28   breaking and uncorroborated alibi defense that a competent attorney likely would not have presented at trial.

1    Petitioner's reliance upon the alleged existence of a phantom suspect to demonstrate

2  actual innocence is even more strained and tenuous.  Abara maintains that he was informed

3  by Sparks Police Department detectives "of other police reports that this check number and

4  amount was also cashed at Sierra Sid's Casino . . . around the same time by a woman with

5  no connection to the petitioner."[35]  The only material presented in support of this allegation,

6  other than petitioner's own self-serving assertion, is the previously-mentioned statement by

7  Maribel Martinez where she refers to Sierra Sid's.  There is no mention in Martinez' statement

8  of a woman and/or whether any such woman was connected to Abara.  The statement refers

9  only to a check numbered 4196 in the same amount "that was cashed at Sierra Sids."

10    Petitioner thus supports this allegation as to a phantom suspect only with what perhaps

11  simply was a misstatement by Martinez together with his own self-serving assertion that

12  unidentified detectives told him that police reports existed reflecting that a woman who was

13  unconnected with him cashed the check at Sierra Sid's.  As touched upon previously, the

14  forged check upon which petitioner's conviction is based quite clearly was cashed at the

15  Alamo Casino, not Sierra Sid's.  The check in evidence was made payable to David E. Abara,

16  not a woman.  The check in evidence was endorsed "David E. Abara," not with a woman's

17  name.  The check in evidence was stamped with a deposit stamp for "Cashell Enterprises,

18  Inc. dba Alamo Travel Center," not with a deposit stamp for Sierra Sid's.[36]  And Marian Cox

19  testified that David Abara, who she knew, presented that check to her at the Alamo Casino,

20  not that it was cashed by a woman or was cashed at Sierra Sid's.

21    To pursue such a phantom-suspect defense at trial based on the scant showing made

22  in this Court, Abara, once again, would have had to take the stand and relate what the officers

23  allegedly told him about the phantom suspect at the Sierra Sid's.  He perhaps may have

24  overcome a hearsay objection based upon the alleged statements being made by an agent

25  or employee of the State.  However, even looking at such testimony on its face, even

26  _____

27    [35]#23, at 14.

28    [36]See #23, Ex. D, at electronic docketing page 30-31.

-19-

*arguendo* establishing that an unidentified woman purportedly unconnected with Abara cashed a similar check at Sierra Sid's, petitioner would not be able to demonstrate that no reasonable juror would have found him guilty beyond a reasonable doubt.  Regardless of what allegedly did or did not happen at another time at Sierra Sid's, the jury in this case had before it substantial evidence – by an eyewitness who knew Abara personally – that *David Abara* cashed *this* forged check at *the Alamo Casino*.  Moreover, as discussed previously, if Abara took the stand in such an ill-advised attempt to establish such a question-begging point, he would do so only at the cost of then subjecting himself to quite damaging impeachment based upon his extensive criminal record, which included, *inter alia*, convictions for forgery and passing fictitious checks.  In all events, in the present federal habeas proceeding, his self-serving and uncorroborated bare assertion that he was told that there were police reports regarding such a phantom suspect falls far, far short of the showing by new reliable evidence that he must make to demonstrate actual innocence under *Schlup*.

Lastly on the claim of actual innocence, petitioner maintains that once again unidentified police officers told him of suppressed surveillance video evidence, and he urges that a forensic handwriting analysis necessarily was conducted.  He asserts:

> . . . [T]he Respondent's [sic] still continue to withhold the results of the forensic handwriting reports and surveillance video tapes.  The petitioner knows this evidence exists because he gave handwriting samples to Sparks detectives for comparison and was also told that they had video of the transaction.
>
> It is common knowledge that it is required by Nevada law that all casino cashier cages must have and maintain surveillance equipment and video and it is standard investigative procedure to gather surveillance video when a police report is taken regarding theft, burglary or forgery.
>
> The only possible reason for this evidence not being provided is that it also supports the petitioner's claim of Actual Innocence.

#23, at 2.

With regard to surveillance video, regardless of what purportedly may be "common knowledge" of what is required by Nevada law, the actual Nevada gaming regulations in force do not support petitioner's broad universal proposition.  Currently, surveillance video of the

-20-

1  customer counter for a casino cage is required only for nonrestricted gaming licensees with
2  more than $3,000,000.00 in annual gross gaming revenue.  Even if the Court were to assume,
3  *arguendo*, that the Alamo Casino were subject to such a requirement at the pertinent time,[37]
4  state gaming standards require the licensee to retain video recordings for a minimum of only
5  7 days.[38]  It inherently took some time for the check to be queried by the bank, for G & W to
6  confirm that the check was a forgery and contact the police, and for the police to pursue the
7  sundry steps of the investigation.  The cashier Marian Cox was not reached to fill out a police
8  statement until April 13, 2005, which was 18 days after the transaction.

9          Recovering a video of an armed robbery at a casino cage within a few hours of such
10  a crime would be one thing.  Recovering a video of a forged check transaction at the cashier's
11  cage at a truck stop casino from weeks before would be quite another.

12          Petitioner's "common knowledge" supposition invokes images of a ubiquitous all-seeing
13  "eye in the sky" as at a major resort casino in Reno or Las Vegas as chronicled in movie lore.
14  However, the functional reality – as to what was recorded initially, how useful any such
15  recording would have been if made taking into account camera angles and equipment quality,
16  and how long any such recording would have been preserved if auto-recorded initially – is not
17  necessarily the same for a cashier's cage at a truck stop casino on the outskirts of Sparks at
18  the last interstate exit heading east into the mountains.  The assertion that a surveillance
19  video necessarily was recorded initially, was useful, and was maintained long enough to be
20  recovered as a police investigation developed weeks later is grounded only in speculation.

21

22          [37]The Court takes judicial notice that the Alamo Casino at 1950 East Greg (#18, Ex. 2, at 7) shares a
23  lot and is associated with a Petro Truck Stop on the very outskirts of Sparks at the last exit before Interstate
    80 heads eastbound into the mountains.  E.g., http://www.thealamo.com/alamo-casino-sparks-petro/.
24
25          [38]*Surveillance Standards for Nonrestricted Licensees*, Section 1.020, Standard 6 & Standard 9, at
    http://gaming.nv.gov/index.aspx?page=51.  The Court notes that the overall standards show a revision date
26  of 11/05 and include revisions to other provisions therein that were effective November 23, 2005.  The
    standards referenced in the text therefore would appear to have been in force at the relevant time in March
27  2005.  Over and above his reference to alleged "common knowledge," petitioner has not identified any actual
    provisions of Nevada statutory or regulatory law then in force that would have required that a usable
28  surveillance video of the forged check transaction be recorded initially and – as importantly – preserved for a
    sufficient interval thereafter to be recovered in a later police investigation of the transaction weeks before.

1       Petitioner's self-serving and uncorroborated bare assertion otherwise that he was "told"

2 by unidentified officers that the police had a video of the transaction falls far short of the

3 showing by new reliable evidence that he must make to demonstrate actual innocence under

4 *Schlup*.[39]

5       With regard to expert handwriting analysis, even if the police *arguendo* took

6 handwriting samples, that does not establish that the samples thereafter were submitted for

7 expert handwriting analysis.[40]

8       Petitioner strenuously argues that the fact that respondents produced the forensic

9 fingerprint report on federal habeas review -- which he at least alleges was withheld from the

10 _____

11    [39]*Cf. Schlup*, 513 U.S. at 865 (referring to "trustworthy eyewitness accounts" in describing types of new reliable evidence).

12

13    The Court additionally notes that – as a matter of "standard investigative procedure" – the police often overstate the evidence that they have in an effort to elicit a confession, which they are allowed to do under the governing law.  Thus, even if police officers *arguendo* told Abara that they had a surveillance video

14 showing the transaction, that would not necessarily tend to establish that such a recording in fact had been made, was functionally usable, and/or still existed (*i.e.,* had not been recorded over) by the time that the

15 police investigation began.

16    [40]Petitioner urges that Cox and Martinez were not handwriting experts, that they were not presented with handwriting samples, and that they had not seen his handwriting for a long time when they testified at

17 trial.  The State was not required to present handwriting expert testimony, however.  The testimony by the witnesses that they were familiar with Abara's handwriting and recognized his handwriting on the forged

18 check was admissible and sufficient evidence, without any requirement that they be presented with additional handwriting exemplars beyond those that they already had encountered within their own persona experience

19 from working with Abara.  *See* N.R.S. 52.035 ("Nonexpert opinion as to the genuineness of handwriting is sufficient for authentication or identification if it is based upon familiarity not acquired for purposes of the

20 litigation."); *see also* N.R.S. 50.265(1)(opinion testimony by a percipient lay witness).   Moreover, the witnesses  testified at trial that they recognized Abara's handwriting *from their experience with his handwriting*

21 *prior to the time of the forgery*, which was close in time to the forgery.  Petitioner's argument regarding the length of time thereafter to trial is irrelevant and presents simply another attempted red herring by petitioner.

22

23    In all events, a petitioner must do more than rehash and reargue the probative value of the evidence introduced at trial in order to pass through the *Schlup* actual-innocence gateway.  *E.g., Lee*, 653 F.3d at 945

24 (Kozinski, C.J., concurring in the result).

25    While petitioner apparently has a fair degree of familiarity by this point with investigative procedures used by a number of police departments in forgery cases, petitioner's assertions as to alleged "standard

26 investigative procedure" nonetheless does not establish what happened in a particular case.  For example, law enforcement and the prosecution may well have come to the conclusion that – given, *e.g.,* that the casino

27 cage cashier knew Abara and was positive in her identification – there was no significant need for forensic handwriting analysis to prove the State's case.  The State, again, does not have to develop and present every

28 form of evidence possible to prove a defendant guilty beyond a reasonable doubt.

1  defense at trial – substantiates his claim that there is withheld, exculpatory handwriting and

2  surveillance video evidence.

3  However, the forensic fingerprint report instead belies rather than substantiates the

4  declaration under penalty of perjury that petitioner made to this Court before it directed a

5  response from respondents.  Abara stated, *inter alia*, that there was an "exculpatory"

6  fingerprint report and that the police reports and pre-sentence investigation reports state that

7  handwriting and fingerprint evidence was analyzed.[41]  To be sure, there was a forensic

8  fingerprint report, but it stated only that the fingerprint taken had no value.  While petitioner

9  continues to mischaracterize the report as establishing that the fingerprint was not his, that

10 is not what the fingerprint report establishes.[42]  Nor do the remaining materials presented

11 contain any reports stating that handwriting evidence was subjected to expert analysis.  Thus,

12 rather than there being contemporaneous references to the existence of exculpatory reports

13 and surveillance video evidence there are no such contemporaneous references.  The Court

14 instead is presented – still to this day – with only petitioner's self-serving bare assertions that

15 exculpatory reports and surveillance video evidence exists.

16 Those bare uncorroborated self-serving assertions by a petitioner facing substantial

17 prison time and who has multiple convictions for offenses involving dishonesty and false

18 statement do not satisfy the *Schlup* standard of new reliable evidence.  Petitioner has not

19 presented new reliable evidence establishing that further forensic and/or surveillance video

20 evidence existed, much less that it had material exculpatory value such that no reasonable

21 juror would convict petitioner in light of such evidence and the trial evidence.

22 In sum, whether the Court looks at petitioner's foregoing multiple factual assertions

23 singly or in combination, petitioner has not established a basis for overcoming the

24 _____

25 [41]#10, at 3.

26 [42]Petitioner's continuing assertions that the State presented knowingly false testimony thus are wholly
   without merit.  Cox could testify based upon her own perception that petitioner placed his thumbprint on the
27 forged check.  The inconclusive forensic report did not belie that testimony.  The State violated no ethical or
   constitutional standard when it presented Cox' testimony as to what she observed and argued reasonable
28 inferences therefrom.

untimeliness of the petition based upon alleged actual innocence.   Nor has petitioner established that an evidentiary hearing would produce evidence more reliable or more probative than the self-serving suppositions and evidence currently before the Court. *See,e.g., Griffin*, 350 F.3d at 966.

The Court accordingly turns to petitioner's argument on equitable tolling.

### Equitable Tolling

Equitable tolling is appropriate only if the petitioner can show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 130 S.Ct. 2549, 1085 (2009) (quoting prior authority).[43]   Equitable tolling is "unavailable in most cases," *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.1999), and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule," *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir.2002)(*quoting United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.2000)).   The petitioner ultimately has the burden of proof on this "extraordinary exclusion."  292 F.3d at 1065.   He accordingly must demonstrate a causal relationship between the extraordinary

---

[43]The Court has proceeded on the assumption that the statement of the standard in the text is substantially equivalent to jurisprudential statements instead framing the standard as one of whether the extraordinary circumstance "made it impossible" to meet the federal filing deadline.  Many Ninth Circuit – but not Supreme Court – formulations of the equitable tolling standard refer to the extraordinary circumstance making it "impossible" to meet the filing deadline.  The Ninth Circuit has clarified, however, that "[d]espite the unequivocal "impossibility" language in our standard, we have not insisted that it be literally impossible for a petitioner to file a federal habeas petition on time as a condition of granting equitable tolling." *Harris v. Carter*, 515 F.3d 1051, 1054 n.5 (9th Cir. 2008).  Rather, the court of appeals has "granted equitable tolling in circumstances where it would have technically been possible for a prisoner to file a petition, but a prisoner would have likely been unable to do so." *Id.  See also Bills v. Clark*, 628 F.3d 1092, 1100 n.3 (9th Cir. 2010)(contrasting language); *Roberts v. Marshall*, 627 F.3d 768, 771 n.5 (9th Cir. 2010), *cert. denied*, 132 S.Ct. 286 (2011)(also suggesting that there may be no substantive difference in the different language used). There may well be nothing more than semantics distinguishing "standing in the way of and preventing a timely filing" from "making it impossible to file timely."  In any event, the Court has not required petitioner to show herein that an extraordinary circumstance literally made it impossible for him to file a timely petition, as opposed to instead being a substantial impediment standing in the way of and preventing a timely filing.

Similarly, the Court has proceeded on the premise that statements in Ninth Circuit opinions referring to "external forces" do not exhaust the types of circumstances that can give rise to equitable tolling. *Cf. Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999)(citing prior cases for an "external forces" standard despite the cited cases not including such language).  Given that, *e.g.*, a mental impairment can provide a basis for equitable tolling under controlling Ninth Circuit law, *see Bills, supra*, it would appear that the potential bases for equitable tolling are not limited to strictly external forces.

1   circumstance and the lateness of his filing.  *E.g., Spitsyn v. Moore*, 345 F.3d 796, 799 (9th
2   Cir. 2003).  *Accord Bryant v. Arizona Attorney General*, 499 F.3d 1056, 1061 (9th Cir. 2007).

3       In his opposition to the motion to dismiss, petitioner asserts that he "was not aware that
4   he was able to file a federal habeas until his counsel notified him of this fact," citing to "see
5   attached exhibit B."  The exhibit is an October 13, 2010, letter from state post-conviction
6   counsel to Abara enclosing the state supreme court's remittitur.  Counsel states in the letter:
7   "You are now free to file in federal court and should do so ASAP."[44]

8       Petitioner's suggestion that he was not aware that he was able to file a federal habeas
9   until counsel notified him of this fact in the October 13, 2010, letter is belied by the calendar.
10  Abara mailed the federal petition for filing on or about *September 27*, 2010, over two weeks
11  *before* the date of the letter.  Petitioner's assertion that he was not aware that he could file
12  a federal habeas petition until counsel's October 13, 2010, letter simply is a falsehood, and
13  not a very good one.

14      Moreover, a habeas petitioner is not entitled to indefinite equitable tolling up until
15  whenever he possibly may be advised some day by an attorney that he is able to file a federal
16  habeas petition.  A petitioner may not base equitable tolling in failing to file a federal petition
17  upon his ignorance of the law and lack of legal sophistication.  *Rasberry v. Garcia*, 448 F.3d
18  1150, 1154 (9th Cir. 2006).  The untolled federal limitation period expired in this case on July
19  7, 2008.  Even if, *arguendo*, Abara was not told by an attorney until over two years later that
20  he was able to file a federal habeas petition, that does not provide a basis for equitable tolling
21  as to his failure to file a timely federal petition over two years before.[45]

22      Petitioner accordingly has not presented a viable across-the-board basis for equitable
23  tolling in his opposition to the motion to dismiss.

24
25      [44]#23, at 5; *id.*, Ex. B (at electronic docketing page 23).
26
27      [45]Even if counsel – who was appointed by the *state* court to represent petitioner in the *state* post-
    conviction proceedings – affirmatively had misadvised him regarding the federal limitation period, which
28  Abara does not assert, such negligence would not provide a basis for equitable tolling.  *See,e.g., Miranda v.
    Castro*, 292 F.3d 1063, 1067-68 (9th Cir. 2002).

1    Petitioner did not pursue in his opposition to the motion to dismiss additional equitable

2   tolling arguments that he had presented in prior papers.  He apparently implicitly concedes

3   that those arguments similarly lacked any possible merit.[46]

4    Petitioner accordingly has not demonstrated a viable basis for equitable tolling.

5

6

7    [46]In the federal petition, Abara urged that the state supreme court erroneously held that his state
petition was not timely filed.  He asserted that the remittitur on direct appeal was issued on May 8, 2007, and
that he mailed mailed his state petition on May 5, 2008, less than one year after the remittitur issued.  This

8   Court pointed out in the show-cause order that: (a) the remittitur issued on May 2, 2007, not May 8, 2007,
such that even the May 5, 2008, mailing date was not within one year of the remittitur; (b) the date of *filing*

9   rather than *mailing* controls under Nevada law because firmly established state law does not apply a prison
mailbox rule for the filing of state post-conviction petitions; and (c) the state supreme court's holding that the

10   state petition was untimely under state law in all events was "the end of the matter" under controlling United
States precedent applying the statutory tolling provision of the federal limitation period.  See #8, at 3-4.

11   Petitioner did not pursue the fallacious argument further thereafter in subsequent papers filed in this matter.

12    In the show-cause response, Abara maintained that he was entitled to equitable tolling from the May
20, 2008, filing of the untimely state post-conviction until the state supreme court held that the petition was

13   untimely.  (He refers to September 27, 2010, which was the date he mailed the federal petition, but the state
supreme court decision was filed on September 10, 2010.)  He did not actively pursue this argument in his

14   opposition to the motion to dismiss, other than to respond to respondents' reference back to the argument.

15    In this regard, the state supreme court hardly "pulled the rug out from under" petitioner in its
September 10, 2010, order of affirmance by broaching the untimeliness issue for the very first time in the

16   case.  Indeed, petitioner expressly noted the untimeliness of the petition in the counseled supplemental
petition filed on January 6, 2009, while seeking to overcome the untimeliness of the state petition.  See #9, at

17   electronic docketing pages 35-36 & n.1.  And the state district court's order denying the petition on that basis
was filed on July 24, 2009.  Abara had no objectively reasonable basis for believing that his state petition was

18   timely during its pendency, given that it was filed 18 days after the state limitation period expired.

19    Moreover, in all events, the United States Supreme Court outlined in 2005 the procedure for a

20   petitioner to follow while pursuing a state petition that is untimely on its face.  A petitioner in that circumstance
should file a protective federal petition and seek a stay while he litigates the facially untimely state petition.

21   *See Pace*, 544 U.S. at 416.  Petitioner could not effectively hide his head in the sand after filing an untimely
state petition, let the federal filing deadline also pass, and then claim an entitlement to equitable tolling of the

22   federal limitation period until a final rejection by the state supreme court of his arguments.  Controlling
Supreme Court authority instead required that the petitioner exercise diligence and timely seek to secure his

23   ability to seek federal relief while litigating the timeliness of the state petition.  Abara did not avail himself of
this procedure.  Nothing stood in the way of and prevented him from doing so, particularly as Abara had

24   exhausted claims from the direct appeal.  (Petitioner's suggestion, #23, at 5, that he thereby would have been
intentionally abusing the stay procedure is wholly meritless.  His argument premised on the assertion that he

25   did not know that he could file a federal petition until counsel told him so is addressed in the text.)  Petitioner
clearly failed to show due diligence by failing to avail himself of the procedure outlined in *Pace*.

26

27    The Court notes that it directed a response on the timeliness issue from the respondents not due to
this meritless equitable-tolling argument but instead to further consider the actual-innocence argument.  The

28   fact that petitioner did not actively pursue this equitable-tolling argument further thereafter is consistent with
the argument's lack of merit.

***Separate Note Regarding Brady Claim***

Petitioner presented a *Brady* claim in state Ground 3 based upon alleged State suppression of favorable fingerprint, handwriting, and surveillance video evidence in his May 20, 2008, state post-conviction petition.[47]   Petitioner similarly presented a *Brady* claim in federal Ground 4 based upon alleged State suppression of favorable fingerprint, handwriting, and surveillance video evidence in his September 27, 2010, federal petition in this matter.[48]  It thus does not appear that any material produced during the subsequent federal proceedings constituted a factual predicate without which the claim could not have been presented previously.  The material produced in federal court constituted only evidence in support of a claim that petitioner already had presented in the state courts on May 20, 2008, and which he simply thereafter failed to timely present in federal court until over two years later.

As discussed at length, *supra*, petitioner otherwise has not demonstrated a basis for overcoming the untimeliness of either the *Brady* claim or of the entire petition based upon alleged actual innocence.  The alleged suppression of favorable evidence by the State, in and of itself, does not establish actual innocence under the *Schlup* standard and thereby render a *Brady* claim timely.  Rather, the petitioner first must demonstrate that no reasonable juror could find the petitioner guilty beyond a reasonable doubt if the allegedly suppressed evidence were considered in conjunction with the trial evidence.  That standard under the *Schlup* actual-innocence gateway is much higher than the corresponding materiality standard on the *Brady* claim itself, which also is discussed below.  *See, e.g., Cooper v. Brown*, 510 F.3d 870, 922-23 (9th Cir. 2007).  If the newly presented evidence does not enable the petitioner to pass through the *Schlup* gateway, then the petition, including the *Brady* claim, remains subject to dismissal with prejudice as untimely.  *Id.*  In short, *arguendo* presenting a *Brady* claim in and of itself neither demonstrates actual innocence under *Schlup* nor otherwise establishes the timeliness of the petition, including of the *Brady* claim itself.

---

[47]See #9, at electronic docketing page 62.

[48]See *id.*, at electronic docketing page 13.

1    In any event, even if the Court were to reach the *Brady* claim on the merits, petitioner

2  has not presented evidence that would establish a viable basis for relief under *Brady*.

3    Under *Brady* and its progeny, a defendant is denied due process if:  (1) the State

4  suppresses evidence either willfully or inadvertently; (2) the suppressed evidence is favorable

5  to the accused, either as exculpatory or impeachment evidence; and (3) the defendant was

6  prejudiced because the suppressed evidence was material, *i.e.*, there was a reasonable

7  probability that, had the evidence been disclosed, the result of the proceeding would have

8  been different.  *See,e.g., Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012), *petition

9  for cert. filed*, 81 U.S.L.W. 3429 (Nov. 15, 2012).  In the present case, even if it were

10  assumed, *arguendo*, that the equivocal forensic fingerprint report was suppressed, there was

11  not a reasonable probability that, had the report been disclosed, the result would have been

12  different at trial.  With regard to the fingerprint, the State presented only testimony by the

13  cashier -- who knew Abara personally -- that she had the customer place his thumbprint on

14  the front of the check.  Petitioner's repeated assertions to the contrary notwithstanding, the

15  State neither presented expert forensic evidence seeking to establish that the fingerprint was

16  Abara's nor told the jury that it had such expert evidence.  Instead, the defense specifically

17  focused on the point -- both in cross-examining the cashier and in closing argument -- that the

18  State had presented no forensic evidence establishing that the thumprint was Abara's.  There

19  is not a reasonable probability that the outcome of the trial would have been different if the

20  defense additionally would have been able to point to an inconclusive forensic report stating

21  that the fingerprint recovered had no value.  The State tied Abara to the crime not by forensics

22  such as fingerprint evidence but instead by the testimony of the cashier who knew Abara

23  personally and who indeed would not have cashed the check had she not known him.

24    Petitioner's speculation that favorable expert handwriting analysis and surveillance

25  video evidence exists otherwise does not support a *Brady* claim.  *See,e.g., United States v.

26  Pelisamen*, 641 F.3d 399, 408 (9th Cir. 2011); *Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir.

27  2001); *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992).  At this juncture,

28  petitioner has not established that an evidentiary hearing would produce evidence more

1  reliable or more probative than petitioner's self-serving suppositions and the evidence

2  currently before the Court -- which involves Abara stating that handwriting and surveillance

3  video evidence has been suppressed and these speculative assertions being denied by

4  representatives of the State.  *See,e.g., Griffin*, 350 F.3d at 966.

5      Petitioner thus does not present a viable *Brady* claim on the merits, even if he

6  otherwise were able to overcome the untimeliness of the claim and the Court *arguendo* were

7  to review the claim *de novo*.

8      **Consideration of Possible Issuance of a Certificate of Appealability**

9      Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must

10  issue or deny a certificate of appealability when it enters a final order adverse to the

11  petitioner.  A district court order granting or denying a certificate of appealability does not

12  eliminate the requirement of filing a timely notice of appeal.  A motion to reconsider the order

13  regarding a certificate of appealability does not extend the time to appeal.

14      As to claims rejected on procedural grounds, the petitioner must show: (1) that jurists

15  of reason would find it debatable whether the petition stated a valid claim of a denial of a

16  constitutional right; and (2) that jurists of reason would find it debatable whether the district

17  court was correct in its procedural ruling.  *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct.

18  1595, 1604, 146 L.Ed.2d 542 (2000).  While both showings must be made to obtain a

19  certificate of appealability, "a court may find that it can dispose of the application in a fair and

20  prompt manner if it proceeds first to resolve the issue whose answer is more apparent from

21  the record and arguments." 529 U.S. at 485, 120 S.Ct. at 1604.  Where a plain procedural

22  bar is properly invoked, an appeal is not warranted.  529 U.S. at 484, 120 S.Ct. at 1604.

23      Jurists of reason would not find the district court's rejection of petitioner's actual-

24  innocence and equitable-tolling arguments and the resulting dismissal of the petition as

25  untimely to be debatable or wrong.

26      The Court  has detailed the trial evidence herein.  **See text, *supra*, at 1-5**.

27      Against that backdrop, jurists of reason would not find the Court's rejection of

28  petitioner's actual-innocence arguments to be debatable or wrong.  The State presented

1   evidence at trial tending to establish that Abara cashed a forged payroll check made payable

2   to Abara, and which was drawn on Abara's former employer's account, at a truck stop casino

3   where the cashier who cashed the check knew Abara personally.  The allegedly suppressed

4   forensic fingerprint report upon which petitioner bases much of his argument did not contradict

5   the cashier's testimony but instead reflected only that the thumbprint that she testified that

6   she had him place on the check was of no value.  **See text, *supra*, at 8-11.**

7       Petitioner's arguments and suppositions that expert handwriting analysis and

8   surveillance video evidence additionally was allegedly suppressed are based on strained

9   factual inferences and, ultimately, on petitioner's own self-serving assertions.  **See text,**

10  ***supra*, at 20-24.**

11      Petitioner's efforts otherwise to discredit the testimony of the State's witnesses are

12  based variously upon mischaracterization of their prior statements, variances in their

13  statements that either were explored at trial and/or that would not prevent a reasonable juror

14  from finding petitioner guilty, and/or argument that simply rehashes inferences to be drawn

15  from the trial evidence.  **See text, *supra*, at 11-14 & 22 n.40.**

16      Petitioner has revised his purported alibi defense over the course of state and federal

17  post-conviction review.  However, even as revised, the purported alibi remains flawed.

18  Petitioner presented a purported alibi argument to the state supreme court that relied upon

19  his being less than a four hour drive away in California eighteen hours after the offense. He

20  revised the alibi on federal habeas review to implausibly suggest that he checked into a mid-

21  priced chain hotel in Hayward, California at 6:00 to 6:30 a.m., with no extra charge on the bill,

22  but this still allowed enough time to drive from Sparks, Nevada to the east San Francisco bay

23  area following the early-morning offense.  His assertion now on federal habeas review that

24  he instead left Nevada the evening before is grounded in nothing other than the self-serving

25  assertions of an inmate seeking to avoid substantial prison time and who has multiple

26  convictions, including convictions involving dishonesty and false statement.  Such an alibi

27  defense based on Abara's own self-serving testimony is not the stuff of which a showing of

28  actual innocence under the narrow *Schlup* gateway is made.  **See text, *supra*, at 15-18.**

1      Petitioner's strained phantom-suspect defense based upon an alleged woman cashing

2  a check at a Sierra Sid's – in a case involving the cashing of a forged check made payable

3  to David Abara that clearly was cashed at and negotiated through the Alamo Casino –

4  clutches at even more gossamer straws. **See text, *supra*, at 19-20.**

5      Accordingly, whether the foregoing arguments are viewed singly or in combination,

6  jurists of reason would not find debatable or wrong this Court's conclusion that petitioner has

7  failed to demonstrate, by newly-presented reliable evidence considered in conjunction with

8  the trial evidence, that no reasonable juror could find him guilty beyond a reasonable doubt.

9      Petitioner's equitable-tolling argument is without merit on its face.  Petitioner urges that

10  he did not know that he could file the federal petition that he constructively filed on *September*

11  *27*, 2010, until he was told that he could do so in an *October 13*, 2010, letter from state post-

12  conviction counsel.   In any event, the underlying premise that an inmate is entitled to

13  equitable tolling until he is advised by an attorney that he may pursue federal habeas relief

14  is contrary to clearly established precedent.  Should petitioner otherwise seek to resurrect on

15  appeal the prior equitable-tolling arguments that he seemingly has abandoned at this point,

16  those arguments similarly are fundamentally flawed and without any conceivable merit.  **See**

17  **text, *supra*, at 24-26 & n. 46.**

18      With particular regard to Abara's *Brady* claim, which he first raised in the state courts

19  in May 2008, over two years prior to the federal petition, his time-bar arguments carry no

20  greater force with respect to this particular claim.  Moreover, even if the Court *arguendo* were

21  to reach the claim on the merits and even on a *de novo* review, petitioner does not present

22  a viable *Brady* claim.  On the merits, there is not a reasonable probability that if the allegedly

23  suppressed forensic fingerprint report had been presented at trial the outcome of the trial

24  would have been different.  Petitioner's speculation that additional evidence allegedly was

25  suppressed is insufficient to sustain a *Brady* claim.  **See text, *supra*, at 27-29.**

26      As to all of these issues, petitioner has not established that an evidentiary hearing

27  would produce evidence more reliable or more probative than petitioner's self-serving

28  suppositions and the evidence currently before the Court.  **See text, *supra*, at 23-24 & 28-29.**

1    IT THEREFORE IS ORDERED that respondents motion (#17) to dismiss is GRANTED

2  and that the petition shall be DISMISSED with prejudice as untimely.

3    IT FURTHER IS ORDERED that a certificate of appealability is DENIED.  **See text,**

4  ***supra*, at 29-31.**

5    The Clerk of Court shall enter final judgment accordingly, in favor of respondents and

6  against petitioner, dismissing this action with prejudice.

7    DATED:    This 19th day of March, 2013.

8

9

10    _____

11    ROBERT C. JONES
      Chief United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28